**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JUDY CLAWSON o/b/o
TINA MARIE CLAWSON,       )
                                     )
               Plaintiff,     )
                                     )     Civil Action No. 13-1001
             v.             )     Judge Nora Barry Fischer
                                     )
CAROLYN W. COLVIN,       )
Commissioner of Social Security,   )
                                     )
             Defendant.   )

## MEMORANDUM OPINION

### I.    INTRODUCTION

Judy Clawson ("Plaintiff") brings this action under 42 U.S.C. § 405(g) seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her daughter, Tina Marie Clawson's, application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–433, 1381–1383(f) ("Act"). This matter comes before the Court on cross motions for summary judgment. (Docket Nos. 10, 13). The record has been developed at the administrative level. For the following reasons, the Court finds that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence. Accordingly, Defendant's Motion for Summary Judgment, (Docket No. 13), will be GRANTED, and Plaintiff's Motion for Summary Judgment, (Docket No. 10), will be DENIED.

## II.    PROCEDURAL HISTORY

Ms. Clawson applied for DIB and SSI on May 14, 2010, alleging a disability onset of August 31, 2005 for purposes of receiving DIB, and April 22, 2010 for purposes of receiving SSI.  (R. at 179-92, 239)[1]. Ms. Clawson claimed that she was totally disabled as a result of limitations stemming from "anxiety," "right elbow," "swelling of both legs and feet," "burning of both legs and feet," "slight herniated disk with mild nerve compression," "cannot stay awake or do not sleep," "thyroid," "emotional problems," "bipolar manic depressive disorder," and "repeated bad teeth and related problems."  (R. at 239).  Ms. Clawson's claims were initially denied on December 14, 2010.  (R. at 103-08, 115-20).  On November 10, 2011, an administrative hearing was conducted in Johnstown, Pennsylvania, as part of a review of Ms. Clawson's claims.  (R. at 39-76).  Ms. Clawson was present to testify, represented by Evan W. Wolfson, and vocational expert Timothy E. Mahler was also present.  (R. at 39-76).  In a decision dated February 21, 2012, ALJ Marty R. Pillion found Ms. Clawson not disabled under the Act. (R. at 19-37).  Ms. Clawson requested a review by the Appeals Council, but this request was denied on May 17, 2013. (R. at 1–5).  Thus, the ALJ's decision is the final decision of the Commissioner.  (*Id.*).

Plaintiff then filed a Complaint with this Court, (Docket No. 3), followed by a Motion for Summary Judgment and supporting brief on October 21, 2013.  (Docket Nos. 10, 11).  Defendant filed a Motion for Summary Judgment and brief on November 8, 2013.  (Docket Nos. 13, 14). Having been fully briefed, the matter is now ripe for disposition.

---

[1]    Citations to Docket Nos. 7-1 – 7-18, the Record, *hereinafter*, "R. at __."

### III. STATEMENT OF FACTS

### A. General Background

Ms. Clawson was born on September 30, 1968 and was 36 years of age on her alleged disability onset date. (R. at 31). She died on March 11, 2012 as a result of acute combined drug toxicity. (R. at 17). Ms. Clawson's mother, Judy Clawson, was thereafter substituted as Plaintiff. (R. at 18). At the time of her initial application, Ms. Clawson listed her mailing address as a triplex in Latrobe, Pennsylvania. (R. at 179-85). Ms. Clawson was single and resided with her son, her son's girlfriend, her grandson, and a roommate. (R. at 44).

Ms. Clawson completed formal education through the tenth grade and later earned a GED. (R. at 44). Ms. Clawson last engaged in substantial gainful activity between 2000 and 2005 as a head cook for the Sisters of Charity. (R. at 198-99). Ms. Clawson worked in a variety of positions prior to that time, including as an assembler for Thermal Industries. (R. at 198-203). As an assembler and cook, Ms. Clawson reportedly spent most of her time on her feet. (R. at 45-46). Following her alleged disability onset date, Ms. Clawson continued to sporadically attempt to work. (R. at 196-98). Ms. Clawson subsisted on public assistance and food stamps, and received medical aid from the state. (R. at 560).

In a self-report of her functional capabilities dated June 9, 2010, Ms. Clawson indicated that she cared for two pet cats, she had no difficulties with personal care, she was capable of cooking and did so on a regular basis, she laundered her own clothes, she regularly walked several blocks to the store to pick up items that she needed, she could ride in a car, drive a car, and use public transportation, she was capable of paying bills, counting change, handling a savings account, and using checks, and she could follow written instructions. (R. at 256-65). Ms. Clawson described having issues with remembering to take medications and attend appointments without reminders, and with falling asleep.

(R. at 259-60, 263).  She stated that she generally kept to herself.  (R. at 261).  Ms. Clawson reported that her stress was "not that bad" when on her prescription medications.  (R. at 262).

## B.    Physical Treatment History

Following a car accident in 2003, Ms. Clawson engaged in physical therapy on eleven occasions.  (R. at 299).  Numerous treatment methodologies had been attempted during her course of therapy.  (R. at 299).  Plaintiff enjoyed minimal improvement in neck and back pain due to "compliance issues with keeping her appointments."  (R. at 299).  Ms. Clawson voluntarily discharged herself in February 2004, because she felt that physical therapy was making her feel worse.  (R. at 299).  Her physical therapist indicated that "compliance issues" diminished Ms. Clawson's progress.  (R. at 299).

Ms. Clawson also began to receive treatment for alleged back, neck, and arm pain stemming from her car accident at Plesko Family Chiropractic in Latrobe, Pennsylvania.  (R. at 309-91).  This treatment began in May 2005 and continued through April 2006.  (R. at 309-91).  In her last treatment note on April 21, 2006 it was indicated that Ms. Clawson still complained of pain in her back, neck, and right elbow.  (R. at 391).  Physical examination revealed severe spasm and significant trigger point tenderness.  (R. at 391).  Ms. Clawson claimed that she was not improving.  (R. at 391).

On May 27, 2006, x-rays were taken of Ms. Clawson's cervical spine, wrists, and pelvis, but the results of the scans were normal. (R. at 424, 427-28).  On November 3, 2008, she submitted to a right lower extremity duplex venous ultrasound, which indicated no deep vein thrombosis[2] or other pathology. (R. at 419).  Additional x-rays of Ms. Clawson were taken on

---

[2]      Deep vein thrombosis (throm-BO-sis), or DVT, is a blood clot that forms in a vein deep in the body. Blood clots occur when blood thickens and clumps together. *What is Deep Vein Thrombosis?*, NATIONAL INSTITUTES OF HEALTH*, available at* http://www.nhlbi.nih.gov/health/health-topics/topics/dvt/ (last visited Jan. 21, 2014).

December 14, 2008 and indicated no pathology in her chest; x-rays of her feet taken on August 19, 2009 were also negative. (R. at 401, 416, 417, 521).

Beginning in January 2009 Ms. Clawson engaged in pain management at Medical Frontiers, L.L.C. in North Huntington, Pennsylvania, and was most frequently under the supervision of physician assistant G. Eric Gifford, P.A.C. (R. at 622-77). Ms. Clawson's medications included Roxicodone[3] and Methadone[4]. (*Id.*). She typically complained of neck, lower back pain, and leg pain. (*Id.*). Edema[5] was occasionally noted on her lower extremities, but her strength was typically full, her sensation and reflexes were intact, her straight leg-raising tests were frequently negative, and her lumbar pain was often noted to be mild. (*Id.*). Ms. Clawson was also regularly observed to be in no apparent distress, to be alert and oriented, and to be pleasant. (*Id.*). No neurological deficits were ever noted. (*Id.*). While Ms. Clawson was often maintained on significant doses of pain medication, she was advised to lose weight and exercise to help her conditions. (*Id.*). Laser therapy in addition to medication was noted to provide significant relief of Ms. Clawson's pain at "acceptable levels." (*Id.*). Ms. Clawson often corroborated that her pain was controlled with treatment. (*Id.*). Ms. Clawson's last treatment note from Medical Frontiers, L.L.C. was dated September 14, 2011, and Ms. Clawson indicated her pain was controlled. (R. at 676-77).

Notes of medical treatment at Latrobe Family Practice in Latrobe, Pennsylvania begin on February 9, 2009, and Ms. Clawson was most often treated there by primary care physician John Horne, M.D. (R. at 498-512, 521-22, 536, 540-45, 606-07, 612-20, 731, 741-48). At that time,

---

[3]    Oxycodone, also referred to as Roxicodone, is a narcotic analgesic used for relief of moderate to severe pain. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0001326/ (last visited February 25, 2014).
[4]    Methadone is a narcotic analgesic medication used for relief of moderate to severe pain, and for the treatment of narcotic drug addiction. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011124/?report=details (last visited February 25, 2014).
[5]    Edema means swelling caused by fluid in your body's tissues. It usually occurs in the feet, ankles and legs, but it can involve your entire body. *Edema*, MEDLINE PLUS, *available at* http://www.nlm.nih.gov/medlineplus/edema.html (last visited Jan. 21, 2014).

Dr. Horne recorded Ms. Clawson's complaints of decreased energy and concentration due to depression and anxiety. (R. at 512). She had not taken psychiatric medications in several years due to financial constraints. (R. at 512). Ms. Clawson also complained of swelling in her legs. (R. at 512). Dr. Horne listed her diagnoses as hypothyroidism, depression, anemia, and hypertension. (R. at 512). Ms. Clawson was to undergo testing for treatment. (R. at 512).

In follow-up appointments with Dr. Horne, it was noted that Ms. Clawson was treated at a pain clinic, and that she was not to be prescribed pain medication. (R. at 510-11). Dr. Horne did provide psychiatric medication during periods when Ms. Clawson was not actively in therapy. (R. at 498, 501-02, 504, 506-08). Throughout his treatment history with her, Dr. Horne indicated that Ms. Clawson experienced swelling in her legs. (R. at 500, 502, 504, 612, 614-15, 617, 731). Ms. Clawson was also noted to increasingly complain of sleep disturbance. (R. at 501). Ms. Clawson's smoking and obesity were oft-noted issues. (R. at 498, 606, 612, 614, 617, 731, 743, 745). Ms. Clawson's diagnoses generally remained the same while under Dr. Horne's care. (R. at 498-512, 521-22, 536, 540-45, 606-07, 612-20, 731, 741-48). Despite her complaints of pain and mental health issues, it was noted by Dr. Horne in April 2009 and August 2009, that Ms. Clawson was capable of working. (R. at 507, 510). However, by February 18, 2010, Dr. Horne indicated in his notes that Ms. Clawson was totally disabled. (R. at 503).

An echocardiogram ordered by Dr. Horne for May 2010 revealed no significant abnormalities. (R. at 522). Sleep studies ordered by Dr. Horne on August 21 and 30, 2010, provided mixed results regarding Ms. Clawson's sleep. (R. at 540-45). The earlier study indicated that Ms. Clawson had mild sleep disordered breathing, minimal hypoxia, and moderate hypersomulence. (R. at 541). The later study indicated that Ms. Clawson had very poor sleep efficiency, abnormal sleep architecture, absence of REM or delta sleep, and daytime sleepiness.

(R. at 543-45).  It was recommended that Ms. Clawson lose weight, try a BiPAP[6] machine, and practice better sleep hygiene.  (R. at 544).  Despite recommendations to the contrary, Ms. Clawson did not use her prescribed CPAP[7] consistently.  (R. at 612, 615, 617).  Treating physicians at Latrobe Family Medicine indicated that Ms. Clawson's issues with her edema were likely secondary to her failure to properly use her CPAP, and her obesity.  (R. at 614, 617).

In Ms. Clawson's final treatment note from Latrobe Family Practice on September 13, 2011, she complained of worsening low back pain.  (R. at 620).  However, she was observed to be in no acute distress, exhibited only "slight tenderness" over the lumbar spine, and had negative straight leg raising test results.  (R. at 620).

Ms. Clawson was referred by Dr. Horne to physiatrist Bill Hennessey, M.D. for electrodiagnostic testing of her lower limbs and for evaluation/treatment recommendations regarding alleged back and leg pain beginning on November 16, 2009.  (R. at 401-04).  Following testing, Dr. Hennessey indicated that the study of both lower limbs was normal and there was no peripheral neuromuscular pathology.  (R. at 404).  He went on to opine that Ms. Clawson's complaints of foot pain were "her own subjectivity without any basis based upon her data collected to date."  (R. at 401).  In fact, the nature of her complaints indicating that her low back pain was worse when lying down pointed "away from a spine condition."  (R. at 401).  Physical examination revealed normal muscle strength, tone, and bulk, normal range of motion in the spine, no tenderness to palpation of the lumbar musculature, and negative straight leg-

---

[6]     A BiPAP machine is a relatively small device that assists with a patient's breathing. It is connected by flexible tubing to a face mask worn by the patient.  *BiPAP (Bi-Level Positive Air Pressure)*, NEW SOUTH WALES GOVERNMENT: AGENCY FOR CLINICAL INNOVATION, *available at* http://intensivecare.hsnet .nsw.gov.au/ bipap-bi-level-positive-air-pressure (last visited Jan. 21, 2014).

[7]     "CPAP, or continuous positive airway pressure, is a treatment that uses mild air pressure to keep the airways open. CPAP typically is used by people who have breathing problems, such as sleep apnea." *What is C-PAP?*, NAT'L HEART, LUNG, & BLOOD INST., *available at* http://www.nhlbi.nih.gov/health/health-topics/topics/cpap/ (last visited Jan. 21, 2014).

raising test results. (R. at 401-02). No swelling of the feet was observed. (R. at 402). Dr. Hennessey stated that Ms. Clawson was not disabled, and that "she clearly can work but has made a personal decision not to do so." (R. at 402). He recommended that she lose eighty pounds and cease smoking. (R. at 402).

An MRI of Ms. Clawson's lumbar spine ordered by Dr. Hennessey on December 8, 2009 showed that there was no abnormality other than a moderately dehydrated disc at L4-L5, with mild loss of height, mild facet joint hypertrophy, and mild foraminal narrowing. (R. at 415). Dr. Hennessey indicated that there was nothing in the electrodiagnostic tests or imaging studies of Ms. Clawson's back and feet to indicate a diagnosis consistent with Ms. Clawson's complaints. (R. at 400). Dr. Hennessey did not believe Ms. Clawson to be disabled, or in need of physical treatment. (R. at 400). Dr. Hennessey reiterated this opinion following examinations and diagnostic testing in February and March 2010. (R. at 394-95, 398-99). Dr. Hennessey's partner, Rich Kozakiewicz, M.D. refused to conduct further testing in June 2011 when Ms. Clawson failed to appear for her appointments as scheduled. (R. at 609-10).

On March 4, 2011, Ms. Clawson was first treated by podiatrist Allen A Dzambo, D.P.M. (R. at 686). Ms. Clawson complained of foot and ankle pain with accompanying numbness and swelling. (R. at 686). Upon examination, Ms. Clawson was noted to be alert, oriented, pleasant, and in no acute distress. (R. at 686). Her reflexes and sensation were all within normal limits. (R. at 686). Strength and muscle tone were normal, and there was no spasm or involuntary movement. (R. at 686). Ms. Clawson was diagnosed with tenosynovitis[8] and sinus tarsi compression. (R. at 687). She was to have an MRI of her right ankle and return for follow-up. (R. at 687).

---

[8]  Tenosynovitis is an inflammation of the lining of the sheath that surrounds a tendon. MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/001242.htm (last visited February 25, 2014).

At a follow-up appointment with Dr. Dzambo on April 20, 2011, Dr. Dzambo noted the results of Ms. Clawson's MRI of her right ankle, (R. at 685), and diagnosed her with tenosynovitis of the foot and ankle and tarsal tunnel syndrome[9]. (R. at 687). Some edema at the right ankle was noted, but all other examination findings remained the same. (R. at 687). Ms. Clawson was prescribed a pneumatic walker to be worn on her right ankle, and was to decrease her activity "as much as possible." (R. at 687). Similar findings were made by Dr. Dzambo in May 2011, and Ms. Clawson was to undergo electrodiagnostic testing for further treatment purposes, but never did so. (R. at 688-89).

## C.    Mental Health History

Between April and May 2010, Ms. Clawson received mental health treatment at Southwestern Pennsylvania Human Services, Inc. ("SPHS") of Latrobe, Pennsylvania. (R. at 458-73). In an initial assessment on April 5, 2010, Ms. Clawson was observed to have normal appearance, behavior, thought content, thought process, cognition, affect, mood, memory, and orientation. (R. at 468-69). In the past, she had been prescribed Zoloft[10] and Ativan[11] for her mental health issues. (R. at 470). At the only two therapy sessions on record in April and May 2010, Ms. Clawson appeared to be nervous or anxious, she played with a water bottle throughout the session, she made minimal eye contact, she spoke quickly and was sometimes difficult to

---

[9]       Tarsal tunnel syndrome is a nerve disorder resulting in pain in the ankle, foot, and toes, and is cause by compression of the posterior tibial nerve. Office of Rare Diseases Research, http://rarediseases.info.nih.gov/gard/7733/tarsal-tunnel-syndrome/resources/1 (last visited February 25, 2014).

[10]       Sertraline (Zoloft) is a prescription drug used for treating depression, obsessive-compulsive disorder (OCD), posttraumatic stress disorder (PTSD), premenstrual dysphoric disorder (PMDD), social anxiety disorder (SAD), and panic disorder. This medicine is an antidepressant called selective serotonin reuptake inhibitor (SSRI). *Sertraline*, NATIONAL LIBRARY OF MEDICINE, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012108/ (last visited Feb. 4, 2014).

[11]       Lorazepam (Ativan) is a prescription drug used for treating anxiety, anxiety with depression, and insomnia (trouble sleeping). This medicine is a benzodiazepine. *Lorazepam*, NATIONAL LIBRARY OF MEDICINE, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0001078/ (last visited Feb. 4, 2014).

understand, she was difficult to engage, and she quickly skipped from topic to topic. (R. at 461-62).

On May 18, 2010, an SPHS psychiatrist evaluated Ms. Clawson's mental status. (R. at 458-60, 463-64). In it, the psychiatrist noted that Ms. Clawson made only "vague" complaints of mental health symptoms. (R. at 458). She appeared older than her stated age and was depressed. (R. at 459). The psychiatrist opined that Ms. Clawson had "selective memory loss," and organized thought processes; however, she seemed irrational and illogical, had below average cognition, and limited insight. (R. at 459). Ms. Clawson was ultimately diagnosed with opiate dependence and depression. (R. at 460). She was assigned a global assessment of functioning score ("GAF") of 60[12]. (R. at 460).

Between October 2010 and May 2011, Ms. Clawson was treated by Geith Shahoud, M.D. at Western Pennsylvania Behavioral Health Resources, L.L.C. of Latrobe, Pennsylvania. (R. at 590-95, 693-704). While under the care of Dr. Shahoud, Ms. Clawson was typically presenting symptoms of depression and anxiety, and displayed sad, depressed mood, flat affect, and sleepiness. (*Id.*). Ms. Clawson fell asleep three times during the course of her treatment, twice in one session. (R. at 696, 698). She was, however, otherwise positively engaged in therapy. (R. at 590-95, 693-704).

Two brief treatment summaries contained in the medical record reveal that between May and November 2011, Ms. Clawson received psychiatric treatment at Counseling Associates of Ligonier, Pennsylvania. (R. at 679, 691). She engaged in individual therapy with outpatient

---

[12]     The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *Id.*

therapist Julie Leon, M.A. and in medication management with Joel Last, M.D. (R. at 679). Ms. Clawson was diagnosed with bipolar disorder and generalized anxiety disorder. (R. at 679, 691). She was typically observed to have depressed mood, blunted affect, excessive anxiety, irritability, emotional lability, and sleep disturbance. (R. at 691). She related experiencing childhood sexual trauma. (R. at 691). Ms. Clawson's pain was believed to exacerbate her mental disorders. (R. at 691). She was noted to require long term psychiatric care. (R. at 691). No treatment notes nor further explanation was provided.

**D.      Functional Capacity Assessments**

On February 18, 2010, Dr. Horne completed an employability assessment form on Ms. Clawson's behalf. (R. at 392-93). He indicated therein that Plaintiff was permanently disabled due to anxiety, depression, hypothyroidism, back pain, and hypertension. (R. at 392). No narrative statement or medical records accompanied this assessment to substantiate Dr. Horne's conclusions; however, he did temper his disability determination by stating that Ms. Clawson needed laboratory studies and doctor follow-up, or "she cannot function in the world." (R. at 393).

On June 3, 2010, Ms. Clawson's dentist John Rawa, D.M.D. indicated in a Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities that Ms. Clawson had no limitations resulting from dental issues. (R. at 477-78). Dr. Rawa stated that there was "no reason" Ms. Clawson could not work. (R. at 479).

On November 12, 2010, Stephen J. Wynert, M.D. completed a consultative physical examination of Ms. Clawson on behalf of the Bureau of Disability Determination. (R. at 547-55). Dr. Wynert noted Ms. Clawson's complaints of constant lower back pain, burning in her legs and feet, and occasional numbness and tingling. (R. at 547). Although she did not have

complaints about edema in her lower extremities, she did claim that her legs were discolored. (R. at 548). Dr. Wynert also noted that Ms. Clawson took Methadone for pain relief. (R. at 547). Dr. Wynert then reviewed Ms. Clawson's medical record, which included unremarkable lumbar MRI results, normal electrodiagnostic studies, and normal venous Doppler results. (R. at 547-48). He reported Ms. Clawson's history of hypothyroidism, diabetes, and hypertension. (R. at 548).

Upon physical examination, Dr. Wynert observed Ms. Clawson to be in no acute distress, she had no edema, clubbing[13], or cyanosis[14] in her extremities, her range of motion in all body joints was normal, she had only minimal tenderness over the lumbar spine and paravertebral areas, straight leg-raising tests were negative, there was no tenderness over any of her joints, she had full strength in all extremities, sensation was normal, reflexes were normal, and there were no gross motor defects. (R. at 548). Additionally, Dr. Wynert witnessed Ms. Clawson get on and off the exam table, and rise from a seated position "without any difficulties;" Ms. Clawson walked around the exam room without difficulty, had mild difficulty walking on her toes, was able to squat and rise from the squatting position, albeit slowly, was able to bend at the hip forward and to the sides without difficulty, and exhibited a normal gait. (R. at 548).

In terms of specific functional limitations, Dr. Wynert found that Ms. Clawson could frequently lift and carry up to twenty-five pounds and occasionally lift and carry fifty pounds, and she could stand and walk for six or more hours of an eight hour work day. (R. at 550). She had no other limitations, postural or otherwise. (R. at 550-51).

---

[13] Clubbing is a change in the areas under and around the toenails and fingernails that occurs with some disorders. The nails also show changes. *Clubbing of the fingers or toes*, MEDLINE PLUS, *available at* http://www.nlm.nih.gov/medlineplus/ency/article/003282.htm (last visited Jan. 21, 2014).

[14] Cyanosis is a bluish color to the skin or mucus membranes that is usually due to a lack of oxygen in the blood. *Skin discoloration-bluish*, MEDLINE PLUS, *available at* http://www.nlm.nih.gov/medlinepl us/ency/article/003215.htm (last visited Jan. 21, 2014).

On December 3, 2010, Ruth Ann Seilhamer, Ph.D. completed a consultative psychological examination of Ms. Clawson on behalf of the Bureau of Disability Determination. (R. at 557-68). When Ms. Clawson presented, she described to Dr. Seilhamer that she had abused alcohol, pain medications, marijuana, and cocaine in the past for extended periods. (R. at 557, 559). She was currently seeking treatment through a methadone rehabilitation program. (R. at 558). Ms. Clawson explained that she suffered sexual abuse at the age of seven, and again between the ages of fourteen and fifteen, at the hands of older men in and associated with her family. (R. at 557-59). As a result, Ms. Clawson claimed to experience panic attacks and post-traumatic stress. (R. at 557). She also reported experiencing depression later in life as a result of financial stressors and relationship issues. (R. at 558). Ms. Clawson had sought psychological treatment and medication management from a variety of sources over the past several years. (R. at 558).

Ms. Clawson also informed Dr. Seilhamer that she woke at 5:00 a.m. for treatment, she cleaned, she prepared her breakfast and lunch, and occasionally cooked, she shopped independently, she managed her money, she had a driver's license, and she managed her medication. (R. at 564). Ms. Clawson spoke with her mother daily, and had friends with whom she maintained contact. (R. at 564). She reported no issues with former co-workers and supervisors, and had no problems with authority figures. (R. at 564).

Dr. Seilhamer initially observed that Ms. Clawson walked to her appointment independently, had a normal gait, and was amicable, cooperative, and polite. (R. at 557). Ms. Clawson was clean, groomed, and appropriately dressed. (R. at 560). She made good eye contact, her speech was coherent, logical, relevant, and of normal pace and volume. (R. at 560). Her posture was erect and her ambulation was normal. (R. at 560). Ms. Clawson's affective

expression was within the normal range, and her affect was dysthymic[15], she denied hallucinations and delusions, she exhibited productive, spontaneous conversation, she had a good capacity for abstraction, she had average intelligence and fund of knowledge, she was capable of completing simple math problems, she was alert and oriented, her memory for recent and remote events was intact, she was aware of social convention and expectations, and behaved accordingly, and she exhibited good insight.  (R. at 561-63).

Dr. Seilhamer diagnosed Ms. Clawson with severe, recurrent major depressive disorder, dysthymic disorder, post-traumatic stress disorder ("PTSD"), panic attack, and varying sorts of substance abuse, in remission.  (R. at 564).  She assigned Ms. Clawson a GAF score of 48[16].  (R. at 564).  Ms. Clawson's prognosis was fair, but was dependent upon her compliance with treatment regimens.  (R. at 564).  Dr. Seilhamer noted that Ms. Clawson had no more than moderate limitations in all functional areas.  (R. at 567-68).

On December 13, 2010, state agency evaluator Emanuel Schnepp, Ph.D., completed a Mental Residual Functional Capacity Assessment ("RFC") of Ms. Clawson. (R. at 572-75). Based upon a review of the medical record, Dr. Schnepp concluded that the evidence supported finding impairment in the way of affective disorders, anxiety-related disorders, personality disorders, and substance addiction disorders.  (R. at 572).  Dr. Schnepp specifically found that Ms. Clawson's basic memory processes were intact; she could understand, retain, and follow simple job instructions; she could make simple decisions; she had adequate impulse control; she could maintain socially appropriate behavior and personal hygiene; and, she was self-sufficient.

---

[15]     Dysthymia (dis-THIE-me-uh) is a mild but long-term (chronic) form of depression. *Dysthymia*, MAYO CLINIC, *available at*  http://www.mayoclinic.org/diseases-conditions/dysthymia/basics/definition/con-20033879 (last visited Jan. 21, 2014).

[16]     An individual with a GAF score of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).

(R. at 574). Plaintiff had no more than moderate limitations in all areas of functioning. (R. at 572-73). As such, Dr. Schnepp believed that Plaintiff could perform simple, routine, repetitive tasks in a stable work environment, could perform production-oriented jobs involving little independent decision-making, and could sustain an ordinary routine without special supervision. (R. at 574). Plaintiff was considered to be capable of engaging in substantial gainful activity. (R. at 574).

On November 10, 2011, Dr. Last completed a Mental Residual Functional Capacity Questionnaire. (R. at 706-10). In it, he indicated that Ms. Clawson had received care from him on three occasions in May, June, and September 2011. (R. at 706). Ms. Clawson had been prescribed a number of medications, but was most recently receiving Zoloft and Neurontin for diagnosed bipolar disorder and generalized anxiety disorder. (R. at 706). At that time, Ms. Clawson was assigned a GAF score of 55, with the highest over the course of Dr. Last's treatment history with Ms. Clawson being 59. (R. at 706). Dr. Last opined that Ms. Clawson's prognosis was fair. (R. at 706). Ms. Clawson was noted to suffer from depressed mood, anxiety, and back pain which affected her ability to focus and concentrate. (R. at 706).

Although Dr. Last found Ms. Clawson to be "seriously limited" in multiple functional areas, he never indicated that she would be "unable to meet competitive standards" in any category of functioning. (R. at 708-09). Ms. Clawson did not exhibit low IQ or reduced intellectual functioning, she could manage her own benefits, and her past substance abuse did not contribute to her functional limitations. (R. at 709-10). Nonetheless, Dr. Last concluded that as of 2008 – prior to his three medication management sessions with Ms. Clawson – Ms. Clawson was totally unable to engage in full-time employment. (R. at 710). He believed Ms. Clawson would miss at least four days of work per month, and that she would experience disabling

limitations for at least a further twelve months. (R. at 710).

## E. Administrative Hearing

An administrative hearing regarding Ms. Clawson's application for DIB and SSI was held on November 10, 2011. (R. at 22). Ms. Clawson testified that she stopped working in 2005 because she could not handle the pressure anymore and was having a lot of trouble with pain in her lower back. (R. at 44). She stated that she took Synthroid[17] because she had a bad thyroid, and that she took Lasix[18] to control the swelling in her feet. (R. at 46). She also mentioned that she had mental health problems, high cholesterol, nerve damage, and breathing problems, and was taking medication for these issues. (R. at 47). The medications, according to Ms. Clawson, were mostly effective in controlling her symptoms. (R. at 47). Ms. Clawson testified that the only side effect of her medications was drowsiness. (R. at 47). The pain that she was experiencing was located at the bottom of her back, the right elbow, the calves, her right foot, and her right shoulder. (R. at 47-48). She stated that pain medication and rest helped relieve her pain. (R. at 48). She was given a BiPAP and a nebulizer. (R. at 49-50). Ms. Clawson mentioned that she smoked, but rarely used alcohol. (R. at 51). She reported having taken prescription medications including Oxycodone, but replied that she stopped taking Methadone. (R. at 52).

As far as her physical capabilities were concerned, Ms. Clawson said that she could probably sit for about an hour before needing to change positions and could probably lift about ten pounds. (R. at 53). She testified that her hands were sometimes swollen and that she could

---

[17] Levothyroxine (Synthroid) treats hypothyroidism. Also treats an enlarged thyroid gland (goiter) and thyroid cancer. Levothyroxine, NATIONAL LIBRARY OF MEDICINE, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0001057/ (last visited Feb. 4, 2014).

[18] Furosemide (Lasix) is a prescription drug that treats fluid retention (edema) and high blood pressure (hypertension). This medicine is a diuretic (water pill). *Furosemide*, NATIONAL LIBRARY OF MEDICINE, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0000793/ (last visited Feb. 4, 2014).

not use them.  (*Id.*).  She reported no problems with reaching with her arms and mentioned that she could kneel.  (R. at 54).

Memory and concentration difficulties were also problems that she experienced.  (R. at 55).  Ms. Clawson testified that she had difficulty sleeping, but that her prescription Remeron[19] was helpful to this end.  (R. at 56, 63).  Grooming, dressing, and bathing were also allegedly problematic.  (R. at 56).  She mentioned that she was capable of caring for her cats, with some help from her roommate.  (R. at 57).  She stated that her right knee bothered her due to a previous automobile accident.  (*Id.*).  She testified that she needed to elevate her legs during the day and at night.  (R. at 60).

Following Ms. Clawson's testimony, the ALJ asked the vocational expert whether a significant number of jobs would exist in the national economy for a hypothetical person of Ms. Clawson's age, educational level, and work background if limited to light work, occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs, no climbing ropes, ladders, or scaffolds, no exposure to hazards such as heights or machinery, no tolerating exposure to atmospheric conditions, such as smoke, fumes, odors, gases, or poor ventilation, work limited to the performance of simple, routine repetitive tasks, making simple work-related decisions, tolerating infrequent changes in work setting (no more than one change per week), and only occasional interaction with coworkers, supervisors, and the public.  (R. at 71).   The vocational expert replied that such an individual could work at the light, unskilled level as an assembler, as Ms. Clawson previously had, as well as a "labeler" and "marker", with 64,000 positions available in the national economy.  (R. at 72).  The vocational expert also testified that at the light, unskilled level there would be "laundry folders", with 67,000 positions available, and

---

[19]     Mirtazapine (Remeron) is a prescription drug used to treat depression.  *Mirtazapine,* NATIONAL LIBRARY OF MEDICINE, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011242/ (last visited Feb. 4, 2014).

"mail room clerks other than United States Postal Service", with 152,000 positions available. (R. at 72).

The ALJ further inquired whether the same individual would be compromised for the assembler work if she needed to sit for 30 minutes after every 30 minutes of standing. (R. at 72). The vocational expert stated that such an individual would be compromised. (R. at 72). However, the vocational expert testified that the light jobs provided in response to the ALJ's initial hypothetical would not be compromised. (R. at 72-73). The ALJ also asked the vocational expert whether, under his initial hypothetical, if instead of light exertion such an individual would be limited to sedentary exertion and would need an option to stand for five minutes after every one hour of sitting, there would be any sedentary duty jobs such a person could perform. (R. at 73). The vocational expert stated that "addresser" would be one such job, with 100,000 positions available. (R. at 73). "Document preparers" would be another example, with 50,000 positions available, as would "sedentary assembler", with 149,000 positions available. (R. at 73). The ALJ then asked the vocational expert about an individual with all of the limitations in the previous hypotheticals in addition to requiring two extra unscheduled breaks of 10 minutes duration. (R. at 73-74). The vocational expert replied that such an individual would not be able to perform the jobs mentioned. (R. at 73-74). However, the vocational expert also testified that the jobs he mentioned are stationary and provide the worker with the opportunity to sit and stand and still remain productive in essential duties. (R. at 74).

IV.    STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[20], 1383(c)(3)[21]; *Sweeney v.*

---

[20]    Section 405(g) provides in pertinent part:

>    Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[21]    Section 1383(c)(3) provides in pertinent part:

*Comm'r of Soc. Sec.*, 847 F. Supp. 2d 797, 800 (W.D. Pa. 2012) (citing *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999)).  Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole.  *See* 5 U.S.C. §706.  The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact.  *Gaddis v. Comm'r of Soc. Sec.*, 417 F. App'x 106, 107 n. 3 (3d Cir. 2011) (citing *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002)).

Substantial evidence is defined as "'more than a mere scintilla'; it means 'such relevant evidence as a reasonable mind might accept as adequate'" to support a conclusion.  *Hagans v. Comm'r of Soc. Sec.*, 694 F. 3d 287, 292 (3d Cir. 2012) (quoting *Plummer v. Apfel*, 186 F. 3d 422, 427 (3d Cir. 1999)).  If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive.  *Id.* (citing *Fargnoli v. Massanari*, 247 F. 3d 34, 38 (3d Cir. 2001)); 42 U.S.C. § 405(g).  When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered.  *Gamret v. Colvin*, 2014 WL 109089 at *1 (W.D. Pa. Jan. 10, 2014) (citing *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947)).  The court will not affirm a determination by substituting what it considers to be a proper basis.  *Chenery*, 332 U.S. at 196 – 97.  Further, even where this court acting *de novo* might have reached a different conclusion, "so long as the agency's factfinding is

---

The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Albert Einstein Medical Center v. Sebelius*, 566 F. 3d 368, 373 (3d Cir. 2009) (quoting *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1191 (3d. Cir. 1986)).

## V.    DISCUSSION

In his decision, the ALJ concluded that Ms. Clawson suffered medically determinable severe impairment in the way of hypothyroidism, hypertension, sleep apnea, diabetes, peripheral neuropathy, history of bilateral leg/foot edema, tenosynovitis of the foot/ankle, tibial tendonitis of the right ankle, gastroesophageal reflux disease, hyperlipidemia, lower back pain, sinusitis, bronchitis, knee arthropathy, obesity, opiate dependence in remission on Methadone, polysubstance abuse, alcohol abuse in remission, cocaine abuse in remission, bipolar disorder, generalized anxiety disorder, major depressive disorder, PTSD, dysthymic disorder, panic attacks, and a personality disorder.    (R. at 24).    As a result of said impairments, the ALJ concluded that Ms. Clawson would be limited to sedentary work, except that she could only:

> occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs. Further, the claimant could not climb ladders, ropes, and scaffolds.  The claimant had to avoid exposure to hazards such as heights or machinery, or atmospheric conditions such as smoke, fumes, odors, dusts, gases, and poor ventilation. Likewise, the claimant required the option to sit for 30 minutes after every 30 minutes of standing.  The claimant was limited to simple, routine repetitive tasks; simple, work related decisions; infrequent changes in work setting defined as  no more than one per week; and occasional interaction with coworkers, supervisors, and the general public.

(R. at 28).  Nevertheless, based upon the testimony of the vocational expert, the ALJ found that Ms. Clawson would be capable of engaging in substantial gainful activity in a variety of jobs existing in significant numbers in the national economy.  (R. at 31-32).  Ms. Clawson was not, therefore, awarded benefits.  (R. at 32).  Plaintiff now objects to this decision by the ALJ,

arguing that the ALJ erred in failing to accord appropriate weight to Ms. Clawson's subjective complaints of pain and limitation, in failing to formulate an RFC which adequately encompassed Ms. Clawson's legitimate, medically established limitations, and – as a result – in failing to present to the vocational expert a hypothetical question reflective of Ms. Clawson's credible limitations. (Docket No. 11 at 10-15). Defendant counters that the ALJ's decision was properly supported by substantial evidence, and should be affirmed. (Docket No. 14 at 9-14). The Court agrees with Defendant.

**A. Plaintiff's Credibility**

Plaintiff first contends that the ALJ did not apply the appropriate legal standard in assessing Ms. Clawson's credibility with regards to her personal descriptions of pain and limitation. (Docket No. 11 at 10-12). Further, Plaintiff argues that the ALJ failed to even discuss all of Ms. Clawson's subjective complaints in his analysis. (*Id.*). It has been established that an ALJ should accord subjective complaints of pain similar treatment as objective medical reports, and weigh the evidence before him. *Burnett v. Comm'r of Soc. Sec.*, 220 F. 3d 112, 122 (3d Cir. 2000). Serious consideration must be given to subjective complaints of pain where a medical condition could reasonably produce such pain. *Mason v. Shalala*, 994 F. 2d 1058, 1067-68 (3d Cir. 1993). In so doing, the ALJ is required to assess the intensity and persistence of a claimant's pain, and determine the extent to which it impairs a claimant's ability to work. *Hartranft v. Apfel*, 181 F. 3d 358, 362 (3d Cir. 1999). This, however, includes determining the accuracy of a claimant's subjective complaints of pain. *Id.* While pain itself may be disabling, and subjective complaints of pain may support a disability determination, allegations of pain suffered must be consistent with the objective medical evidence on record. *Ferguson v. Schweiker*, 765 F. 2d 31,

37 (3d Cir. 1985); *Burnett*, 220 F. 3d at 122. As discussed by the ALJ, Ms. Clawson's claims in the present case were not so consistent.

As an initial matter, the simple fact that the ALJ did not explicitly discuss every subjective claim made by Ms. Clawson, alone, is not dispositive. "A written evaluation of every piece of evidence is not required," and "the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it." *Phillips v. Barnhart*, 91 F. App'x 775, 780 n. 7 (3d Cir. 2004) (citations omitted). It has never been required that the ALJ discuss every piece of *relevant* evidence, let alone evidence which does not have ready support in the objective record. *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004) (citing *Fargnoli*, 247 F. 3d at 42).

Plaintiff argues that the ALJ did not properly consider Ms. Clawson's complaints of limitation with respect to activities of daily living such as caring for pets, preparing meals, cleaning, caring for herself, taking medications, and making appointments. As to these statements, the ALJ noted in his discussion that Ms. Clawson's beliefs about her physical capabilities were not supported by the findings of Dr. Hennessey over the course of several physical examinations, and neither were these complaints supported by electrodiagnostic testing or imaging studies. (R. at 25). Dr. Hennessey repeatedly stressed that there was no physical basis for Ms. Clawson's complaints. (R. at 25, 28-29). In his consultative examination findings, Dr. Wynert similarly found no severe physical conditions in line with Ms. Clawson's complaints. (R. at 29). Additionally, in her initial Adult Function Report from the time of her application for benefits, Ms. Clawson included few issues of the severity later claimed. (R. at 30). Thus, the objective evidence – as noted by the ALJ in his discussion – strongly suggested a lesser degree of limitation than that claimed by Ms. Clawson, and the ALJ was entitled to rely upon it. *Turby v. Barnhart*, 54 F. App'x, 118, 121-22 (3d Cir. 2002).

While Plaintiff also argues that it was error not to credit Ms. Clawson's claims of debilitating fatigue, the ALJ's failure to specifically mention that she fell asleep during two therapy sessions does not add significant weight to Ms. Clawson's claims, particularly when the vast majority of her treatment at Western Pennsylvania Behavioral Health Resources involved no issues with sleeping during therapy. Further, the fact that the ALJ credited the mild result of one sleep study over the more severe results of another when declining to accord Ms. Clawson full credibility does not merit a remand, particularly when Plaintiff points to no objective indications by treating medical sources that Ms. Clawson experienced significant limitation as a result of her sleepiness. As such, the ALJ's decision not to accord significant weight to Ms. Clawson's allegations regarding her ability to function due to sleep difficulties was supported by substantial evidence.

Finally, as to any subjective complaints regarding limitations allegedly stemming from Ms. Clawson's diagnosed bipolar disorder, the Court notes that Plaintiff fails to point to bipolar-related limitations not already accommodated by the ALJ in his RFC. (Docket No. 11 at 15).

**B.    Residual Functional Capacity**

Plaintiff next argues that the ALJ failed to properly evaluate the medical evidence in determining Ms. Clawson's RFC. (Docket No. 11 at 12-14). As to this matter, the United States Court of Appeals for the Third Circuit has held that although an ALJ can weigh the credibility of the evidence when making a RFC determination, he or she must give some indication of the evidence which is rejected and the reasons for doing so. *Burnett*, 220 F. 3d at 121. "'In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Id.* (quoting *Cotter v. Harris,* 642 F. 2d 700, 705 (3d Cir. 1981)). However, courts must still review an ALJ's decision regarding a claimant's residual

functional capacity "with the deference required of the substantial evidence standard of review." *Burns*, 312 F. 3d at 129. Limitations which are in conflict with the medical record are not required to be included in a RFC formulation. *Lynn v. Colvin*, 2013 WL 3854460, *14 (W.D. Pa. July 24, 2013) (citing *Rutherford v. Barnhart*, 399 F. 3d 546, 554 (3d Cir. 2005)).

Plaintiff asserts that the ALJ's RFC was lacking due to a failure to incorporate the limitations findings of Dr. Last, the failure to thoroughly discuss Ms. Clawson's mental health treatment history, and the failure to discuss the effect of Ms. Clawson's obesity on her ability to work. As to the findings of Dr. Last, the Court finds that the ALJ gave said findings sufficient consideration in light of the noted internal inconsistencies, external inconsistencies, and lack of a treatment record for the ALJ – and this Court – to review. It is generally true that a treating physician's opinions may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Comm'r of Soc. Sec.*, 554 F. 3d 352, 355 (3d Cir. 2008) (quoting *Morales v. Apfel*, 225 F. 3d 310, 317 (3d Cir. 2000)); *Plummer v. Apfel*, 186 F. 3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F. 2d 1348, 1350 (3d Cir. 1987)). However, such is not the case at present. Dr. Last treated Ms. Clawson on only three occasions, and the treatment notes from those sessions were not provided to the ALJ. As such, controlling weight will not simply be awarded by default.

Moreover, even "the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." *Chandler v. Comm'r of Soc. Sec.*, 667 F. 3d 356, 361 (quoting *Brown v. Astrue*, 649 F. 3d 193, 197 n. 2 (3d Cir. 2011)). A showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a physician's opinion outright, or accord it

less weight. *Brownawell*, 554 F. 3d at 355. Moreover, a medical opinion is not entitled to any weight if unsupported by objective evidence in the medical record. *Plummer*, 186 F. 3d at 430 (citing *Jones v. Sullivan*, 954 F. 2d 125, 129 (3d Cir. 1991)). The lack of treatment notes from Dr. Last aside, as noted by the ALJ, Dr. Last's serious limitations findings were not reflected in the findings of other medical sources such as Dr. Schnepp or Dr. Seilhamer. (R. at 28). Dr. Last's own opinion was internally inconsistent, as he assigned Ms. Clawson a GAF score of 55 – indicating only moderate limitation – but equivocally indicated that Ms. Clawson would have serious functional limitation. Given the lack of objective treatment records from Dr. Last's time caring for Ms. Clawson, as well as the obvious internal and external inconsistencies in his functional capacity assessment, the ALJ properly accorded his opinion minimal weight.

As to Plaintiff's counterpoint that the ALJ's treatment of the GAF scores in Dr. Last and Dr. Seilhamer's opinions was inappropriately inconsistent, Plaintiff is incorrect. The ALJ accorded the entirety of Dr. Last's opinion little weight because of the above discussed issues. (R. at 28). He only accorded Dr. Seilhamer's GAF score little weight, because it was not in accord with other findings made by Dr. Seilhamer or the objective medical record. (R. at 27-28). He clearly did credit her other findings, however, because the findings found support in the objective record. The ALJ, therefore, properly accorded the objectively supported portion of Dr. Seilhamer's opinion weight. Due to the fact that Dr. Last's opinion did not have the same objective support, and because the one-time GAF score did not add anything substantive to the discussion of Ms. Clawson's abilities, *see Coy v. Astrue*, 2009 WL 2043491 at *14 (W.D. Pa. Jul. 8, 2009) (citing *Chanbunmy v. Astrue*, 560 F. Supp. 2d 371, 383 (E.D. Pa. 2008)) ("A GAF score, without evidence that it impaired the ability to work, does not establish an impairment."), the ALJ correctly accorded Dr. Last's opinion little weight.

Plaintiff also complains that by failing to provide any in-depth discussion of Ms. Clawson's mental health treatment notes, the ALJ committed reversible error. The Court disagrees, noting the paltry nature of the mental health treatment notes and the lack of citation to any specific objective evidence in these notes indicating that Ms. Clawson suffered limitations greater than those accommodated in the ALJ's RFC. As discussed, an ALJ need not cite all evidence a claimant presents, particularly when said evidence will not affect the ALJ's disability analysis. *Johnson v. Comm'r of Soc. Sec.*, 529 F. 3d 198, 204 (3d Cir. 2008). Such is the case with Ms. Clawson's treatment notes from mental health care providers.

Similarly, Ms. Clawson's obesity and lower extremity swelling would not affect the ALJ's disability analysis. The ALJ noted that both Drs. Hennessey and Wynert found no lower extremity swelling upon examination, and Ms. Clawson had informed Dr. Wynert that her swelling improved with medication. (R. at 28-29). Plaintiff cites to Dr. Horne's treatment notes from June 3, 2011, which state:

> ankles swelling – last week they were good, now they are getting puffy again. she uses lasix (40mg) daily. admits to eating a poor diet, including using salt. does not use CPAP every night, and when she does use it, she takes it off half-way through the night.

(R. at 611-12). Yet, this treatment note is far from an indication of disabling limitation stemming from obesity and leg swelling. If anything, it demonstrates that Ms. Clawson's legs had only recently begun swelling, before which they "were good," and that Ms. Clawson was not compliant with suggestions that she improve her diet to lose weight, and use her CPAP machine. The Court finds no error in the ALJ's decision not to accord greater functional limitation to Ms. Clawson's obesity and lower extremity edema.

**C.      Hypothetical Question**

Plaintiff last contends that, due to the errors in weighing the medical opinion evidence, weighing credibility, and determining Ms. Clawson's residual functional capacity, the hypothetical question posed to the vocational expert was incomplete, and could not be considered substantial evidence in support of Ms. Clawson's ability to engage in substantial gainful activity. (Docket No. 11 at 14-15). In terms of the ALJ's hypothetical to the vocational expert, in light of the above discussion, it is clear that the ALJ provided a sufficient analysis of the medical evidence underlying Ms. Clawson's claim for disability benefits. Having provided adequate record evidence to support his ultimate factual findings, this Court can conclude nothing other than that all the credibly established medical impairments suffered by Ms. Clawson were properly incorporated into the hypothetical to the vocational expert and were accommodated fully in the ALJ's RFC assessment. Therefore, the ALJ's hypothetical was not flawed.

**VII.   CONCLUSION**

Based upon the foregoing, this Court finds that the decision of the ALJ was supported by substantial evidence in the record. Reversal or remand of the ALJ's decision is not appropriate. Accordingly, Plaintiff's Motion for Summary Judgment is DENIED; Defendant's Motion for Summary Judgment is GRANTED; and, the decision of the ALJ is AFFIRMED. Appropriate Orders follow.

<i><u>s/ Nora Barry Fischer</u></i>
Nora Barry Fischer
United States District Judge

Dated:  February 26, 2014
cc/ecf:  All counsel of record